# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: June 5, 2020

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * | | |
| JEAN GENTILE, | * | PUBLISHED |
| | * | |
| Petitioner, | * | No. 16-980V |
| | * | |
| v. | * | Special Master Nora Beth Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Pain and Suffering; Causation-In-Fact; |
| AND HUMAN SERVICES, | * | Influenza ("Flu") Vaccine; Shoulder Injury |
| | * | Related to Vaccine Administration |
| Respondent. | * | ("SIRVA"). |
| | * | |
| * * * * * * * * * * * * * * * | | |

Leah V. Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for petitioner.
Robert P. Coleman, U.S. Department of Justice, Washington, DC, for respondent.

## RULING ON DAMAGES[1]

On August 10, 2016, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, et seq.,[2] (the "Vaccine Act" or "the Program"). Petitioner alleges that she suffered a left shoulder injury caused by her October 15, 2015 influenza ("flu") vaccination. Petition at 1. A Ruling on Entitlement was filed October 29, 2018, finding that petitioner was entitled to compensation. Ruling on Entitlement ("Ruling") dated Oct. 29, 2018 (ECF No. 46). The parties now seek a ruling awarding damages to petitioner.

---

[1] Because this Ruling contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

1

After consideration of all of the evidence, and for the reasons described below, the undersigned finds that petitioner is entitled to an award of $85,000.00 for actual pain and suffering, $500.00 per year for her life expectancy for future pain and suffering, and $1,199.38 for actual unreimbursable expenses.[3]

## I.   PROCEDURAL HISTORY

The procedural history was set forth in the Finding of Fact and Ruling on Entitlement issued October 29, 2018, and will not be repeated here. See Ruling at 2. Following the filing of the Ruling, petitioner filed additional medical records. Petitioner's Exhibits ("Pet. Exs.") 21-22. The case was selected for alternative dispute resolution ("ADR") on September 23, 2019. P-100 Initial Order dated Sept. 23, 2019 (ECF No. 54). On September 30, 2019, the case was removed from the Special Processing Unit ("SPU") and assigned to the undersigned's docket. ADR was not successful in resolving damages and the parties asked the undersigned for a ruling on damages. See Pet. Status Report ("Rept."), filed Dec. 23, 2019 (ECF No. 58). Petitioner subsequently filed additional evidence, including additional medical records and affidavits. Pet. Exs. 23-28. A hearing on damages was held on February 26, 2020. Petitioner and three lay witnesses testified, including Vincent Gentile, Barbra Glader, and Timothy Glader. Transcript ("Tr.") 3.

The parties have now submitted their respective memoranda outlining their positions on damages and the issue is ripe for adjudication.

## II.   FACTUAL HISTORY

### a. Medical Records

On October 15, 2015, petitioner, an elementary school teacher, then age fifty-eight, received a flu shot in her left shoulder. Pet. Ex. 1 at 2; Pet. Ex. 3 at 4; Pet. Ex. 6 at 89. Prior to the flu shot, there is no evidence to suggest that petitioner suffered any previous left shoulder injuries or had complaints of left shoulder pain. Petitioner's past medical history was significant for reversible cerebral vasoconstriction syndrome ("RCVS"), a disease characterized by thunderclap headaches. Pet. Ex. 5 at 6. She also had a history of anxiety, depression, hypothyroidism, temporomandibular joint disorder, symptomatic menopause, and knee pain. Pet. Ex. 5 at 2; Pet. Ex. 13 at 5, 16.

Petitioner visited the emergency room for diarrhea on October 16, 2015. Pet. Ex. 7 at 33-36. On October 26, 2015, petitioner sought medical care for headaches. Pet. Ex. 6 at 5-9. There is no mention of shoulder pain during either visit.

Petitioner first complained of left shoulder pain to a health care provider on December 3, 2015, when she visited orthopedist Dr. Mark R. Alexander. Pet. Ex. 2 at 2. Dr. Alexander stated, "[p]atient reports that she noticed the pain and it seems like to her that it was following her flu shot that she got about a month ago . . . . She now complains of pain lifting the arm and

---

[3] The parties have agreed to reimbursement in the amount of $1,199.38 in past unreimbursed expenses. See Joint Status Report, filed Apr. 17, 2020 (ECF No. 80).

2

pain with dressing." Id.  Upon examination, petitioner had some tenderness on the lateral aspect of her shoulder, "positive Neer's and Hawkins" but full range of motion. Id.  An X-ray showed slightly down sloping acromion but was otherwise unremarkable. Id.  Petitioner was diagnosed with left shoulder impingement, treated with a corticosteroid injection, and referred to physical therapy. Id. at 2-3; Pet. Ex. 10 at 1.

Petitioner began physical therapy on December 7, 2015, complaining of left shoulder pain "which started about 5 weeks ago when she got a flu shot." Pet. Ex. 3 at 3.  Physical therapist, Matthew Quanrud noted that petitioner received an injection for the left shoulder, "which helped take most of the pain away." Id.  Petitioner's range of motion in her left shoulder was within normal limits but she had pain with flexion, and internal and external rotation. Id. at 4.  Her pain level was documented at 2/10. Id.  Aggravating factors included dressing, grooming, overhead activities, and reaching. Id.  Assessment was left shoulder pain with hypomobile thoracic spine, AC joint, and impaired rotator cuff muscle function. Id. at 5.  Prognosis was good. Id. at 6.

At her second physical therapy appointment on December 14, 2015, petitioner reported that her shoulder was feeling better. Pet. Ex. 10 at 16.  She reported that she had been doing exercises at home. Id.  She recently suffered a fall that did not impact her left shoulder. Id.  Petitioner also mentioned some neck tightness and pain "that has been there for years." Id.

On December 17, 2015, petitioner was evaluated for headaches by Dr. Michael R. Wexler. Pet. Ex. 8 at 1.  Petitioner reported a "lifelong history of headache problems beginning with severe migraines, but 3 years ago she had reversible cerebral vasoconstriction which began with a thunderclap headache." Id.  Petitioner also reported she had a similar thunderclap headache the first week in October. Id.; Pet. Ex. 6 at 85.  Petitioner described the headache as "horrible (comfort level 0/10) and the effects linger[ed] for a couple of weeks." Pet. Ex. 8 at 1.  In his review of systems, Dr. Wexler noted that petitioner's musculoskeletal system was "negative." Id. at 3.  Physical examination of the extremities was documented as being normal. Id. at 4.  There is no reference to shoulder pain at that visit.

Petitioner was seen by her primary care physician Dr. Joshua Jacob Mueller for a follow-up appointment for diarrhea on February 18, 2016. Pet. Ex. 13 at 97-98.  There is no mention of shoulder pain during this visit.

Petitioner's third visit to physical therapy was on February 22, 2016. Pet. Ex. 3 at 10-12; Pet. Ex. 10 at 19.  She reported continued left shoulder pain, and that "[g]etting dressed remains the most painful," as well as continued pain reaching overhead and bearing weight. Pet. Ex. 10 at 19.  Range of motion remained within normal limits, with symptoms on flexion and external rotation. Id.  Petitioner stated that her shoulder pain was waking her at night with throbbing pain and ibuprofen did not help. Id.  She rated her pain 5/10 with rotation movement and 3-4/10 with overhead motion. Id.

On February 24, 2016, petitioner saw her orthopedist, Dr. Alexander, for follow-up. Pet. Ex. 10 at 4.  Dr. Alexander noted "full range of motion with pain [in the] end range [of] forward elevation." Id.  Petitioner continued to complain of left shoulder pain with some throbbing at

night.  Id.  Two days later on February 26, 2016, she returned to her orthopedist for her MRI results.  Id. at 5.  Her MRI showed adhesive capsulitis without rotator cuff tear and petitioner's diagnosis was "left shoulder pain and stiffness secondary to adhesive capsulitis."  Id. at 6.

Petitioner received her second cortisone injection for her shoulder, under fluoroscopic guidance, on April 5, 2016.  Pet. Ex. 10 at 9.  She reported that her pre-procedure pain level was 2/10, and post-procedure pain was 0/10.  Id.

Petitioner attended fifteen additional physical therapy sessions between February 29, 2016 and May 9, 2016.  Pet. Ex. 10 at 22-68.  On May 9, 2016, petitioner was discharged from physical therapy.  Id. at 68.  On discharge, she reported that her shoulder felt good, but she still had some "mild achiness and waking up due to pain."  Id. at 69.

A chart of with some pertinent information from petitioner's physical therapy records appears below.

| | |
|---|---|
| 2/29/16 Visit #4 | Most painful activities are laying on left side and reaching to put on coat. Pet. Ex. 10 at 22. |
| 3/4/16 Visit #5 | Rates soreness 2/10. Pet. Ex. 10 at 25. |
| 3/9/16 Visit #7 | Not sleeping well.  Using arm more.  Improved range of motion. Pet. Ex. 10 at 31. |
| 3/14/16 Visit #8 | Definitely notices more range of motion. Pet. Ex. 10 at 34. |
| 3/18/16 Visit #9 | Range of motion "pretty good overall."  Still having "a lot of trouble sleeping." Pet. Ex. 10 at 37. |
| 3/25/16 Visit #11 | Took Aleve and was able to sleep through the night for the first time.  Hasn't had any pain with school activities. Pet. Ex. 10 at 44. |
| 4/1/16 Visit #13 | Shoulder sorer.  Pain at rest 1/10. Pet. Ex. 10 at 50. |
| 4/4/16 Visit #14 | Sore even when resting.  Does not rate pain.  Getting injection tomorrow. Pet. Ex. 10 at 53. |
| 4/11/16 Visit #15 | Feeling better, not 100%.  Sleep is difficult.  Using arm more due to feeling better. Pet. Ex. 10 at 56. |
| 4/26/16 Visit #18 | Occasionally wakes at night with pain but not nearly as intense.  Shoulder feeling "really really good."  "Barely even thinks about the shoulder as there is no pain."  Very infrequent catching. Pet. Ex. 10 at 65. |

4

| 5/9/16<br>Visit #19 | Range of motion good. Woken up and wonders if shot has worn off.<br>Pet. Ex. 10 at 68. |

After her discharge from physical therapy on May 9, 2016, there is no documentation in petitioner's medical records that she had shoulder pain or treatment of her shoulder injury until approximately one year later on July 14, 2017, when she received another cortisone injection. Pet. Ex. 18 at 1-3. Petitioner's records are then silent as to any problem with her shoulder for another seven months. On March 15, 2018, petitioner's "Patient Active Problem List" in her medical records state "[c]hronic left shoulder pain after influenza vaccine. Capsulitis. Had 3 injections (cortisone) which helped. . . . Range of motion and use of arm is ok, feels catching sensation with abduction." Pet. Ex. 20 at 3.

Moving forward to 2019, at her annual physical with Dr. Mueller on January 18, 2019, petitioner reported that once or twice a week she still had shoulder pain that awakened her at night with throbbing pain. Pet. Ex. 21 at 2. Dr. Mueller recommended that she take Tylenol, use ice, and follow up with orthopedics. Id. at 4.

Ten months later, on October 14, 2019, petitioner presented to Dr. Mueller's office with complaints of shoulder pain. Pet. Ex. 22 at 1. Dr. Mueller stated, "[r]ecurrent left shoulder pain. Started a few years ago after a flu vaccine. Had cortisone [shot] which initially did not help but then did another injection into capsule [which did] help." Id. Dr. Mueller documented that petitioner had good range of motion. Id. at 2. He assessed petitioner with "chronic left shoulder pain." Id. He ordered Celebrex and physical therapy, and recommended that petitioner follow up with orthopedics if she did not improve. Id.

On October 28, 2019, petitioner saw Physical Therapist, Bradley Joseph Zasada. Pet. Ex. 23 at 1. Mr. Zasada's records state that petitioner's shoulder would sometimes "catch" during the day and "throb" during the night. Id. Petitioner reported taking Celebrex as needed for the pain. Id. Her current pain level was six. Id. She had limitations in her range of motion with external and internal rotation. Id. at 2. Mr. Zasada recommended physical therapy once per week for six weeks. Id. at 3. Petitioner did not return for the recommended physical therapy.

On February 5, 2020, petitioner saw Dr. Alexander, reporting "catching" of her left shoulder, pain with reaching and overhead movements, and disrupted sleep due to her shoulder. Pet. Ex. 29 at 1. Dr. Alexander reviewed petitioner's history of cortisone injections, noting that she reported that the fluoroscopy guided injection provided relief for approximately one year. Id. Physical examination revealed mild tenderness and slight loss of range of motion in forward flexion and abduction. Id. O'Brien's test was positive and she exhibited positive impingement signs under the Neer and Hawkins tests. Id. Dr. Alexander recommended a repeat joint cortisone injection. Id. Petitioner's medical records do not indicate whether she received the cortisone injection.

### b. Dr. Mark R. Alexander's Letters

Petitioner submitted two letters from her treating orthopedist, Dr. Alexander. In his first letter, dated November 27, 2016, Dr. Alexander stated that he first saw petitioner on December

5

3, 2015, for "left shoulder pain that started after she had a flu shot about a month prior." Pet. Ex. 14 at 1. Dr. Alexander also stated that petitioner had no preexisting shoulder condition prior to her vaccination, and that petitioner reported her shoulder pain started soon after the flu shot in the fall of 2015. Id. Dr. Alexander "believe[d] that the cause of [petitioner's] shoulder pain and adhesive capsulitis likely was due to the vaccine [she] received." Id.

In his second letter, dated March 19, 2020, Dr. Alexander stated that "to this day [petitioner] continues to have left shoulder pain." Pet. Ex. 31 at 1. Dr. Alexander explained that he had been asked to opine whether petitioner's pain was permanent. Id. In reply to that question, he stated that "[g]iven the fact that we are now five years out and she continues to have pain, I would suspect that this would be permanent. I have no reason to think this will suddenly resolve at this point." Id. Dr. Alexander suggested fluoroscopic-guided injection and/or referral to a pain clinic as potential options to address petitioner's pain. Id.

### c. Petitioner's Affidavits

In support of her petition, petitioner submitted several affidavits and a signed personal statement. Pet. Exs. 11, 15, 16, 19, 24.

In one of petitioner's affidavits, she stated she received a flu shot on October 15, 2016. Pet. Ex. 15 at ¶ 1. The following day, she "woke up to a very sore, stiff arm and shoulder." Id. at ¶ 2. Petitioner assumed "it was just a reaction to the shot" and that she "just kept thinking and hoping that [her] arm would get better, but it didn't." Id. Petitioner also explained that she did not seek treatment sooner because she "kept thinking that it was a bad reaction but that it would only last a few days. Those days turned into weeks with the pain increasing as well as self-medication of various combinations of Tylenol, Ibuprofen, Aleve and ice packs." Id. at ¶ 10. Petitioner also stated that she delayed in seeking treatment because of her profession as a teacher. Id. at ¶ 11. According to petitioner,

> At the time of my shot, I had a classroom of students with very high needs including severe autism, behavior disorders, special education students, a non-verbal student and a student who was both visually and hearing impaired. Often students with these types of extreme needs do not do well when there is a substitute, not only for that day, but a break in routine can upset special needs students for several days. So, while it is possible for me to take a day off during a normal work week, it would always be as a last resort. When serving in this caretaker role, I put the needs of my students before my own.

Id.

In her second affidavit, petitioner explains that she did not mention the shoulder pain during the October 16, 2015 emergency room visit because she "assumed it was just a bad reaction to the injection from one day previous and that it would get better in a few days." Pet. Ex. 19 at ¶ 2. Further, her "main concern at the time of [that] appointment was severe diarrhea and dehydration." Id. Petitioner further explained that on October 26, 2015, she saw her doctor due to a "thunderclap, also referred to as a lone acute severe headache." Id. at ¶ 3. Petitioner

states that her shoulder was very painful and stiff, but her "overwhelming concern and fear during [that] visit was [her] headaches, which is why the shoulder pain was not raised as an issue." Id.

In her last affidavit, petitioner discussed how her vaccine injury contributed to her depression, divorce, relinquishing her beloved dog, and concerns about her future. Pet. Ex. 24. Petitioner also discussed these same topics at the hearing on damages.

### d. Hearing Testimony—Petitioner

Petitioner testified that she received the flu vaccine on October 15, 2015 in her left arm. Tr. 5-6. She began to have deep throbbing pain that night and applied ice to her arm. Tr. 6. Subsequently, she began having trouble raising her arm, and washing her hair was especially difficult. Tr. 7. Holding a large book to read to her students was also a challenge. Tr. 8. She found ways to adapt, and her students helped her in the classroom more. Id. Petitioner's pain progressively increased while her range of motion decreased. Id. Petitioner's shoulder pain also affected her sleep once or twice per week. Tr. 10. This led to sleep deprivation which made her feel "raw." Tr. 11. Petitioner explained that she was less patient and, on some days, this affected her teaching. Id. As a third grade classroom teacher, petitioner's job requires a lot of physical movement, getting up and down from the floor, and being active with her students. Tr. 12. She stated that her injury made her feel old and made her have to ask for more help. Tr. 12-13.

Petitioner did not seek treatment because she kept expecting her arm to get better. A co-worker saw her crying at her desk and recommended that petitioner see her orthopedist, Dr. Alexander. Tr. 14. She saw Dr. Alexander on December 3, 2015. Pet. Ex. 2 at 2. He performed range of motion tests and told her that flu shots can cause shoulder injuries. Tr. 15. Dr. Alexander administered a cortisone injection for her shoulder at the first visit. Id. Unfortunately, the cortisone injection did not really help. Tr. 16. Physical therapy helped to strengthen her shoulder, but it did not help the pain inside her shoulder. Id. Also, if petitioner was too aggressive with her therapy, shoulder pain would wake her at night. Id. Ultimately, she attended nineteen physical therapy sessions. Tr. 17. She still had pain after the cortisone injection and physical therapy. Id.

The worse pain that petitioner experienced with her shoulder injury occurred in the fall of 2015. Tr. 18. Petitioner testified that the pain "really turned my life upside down." Id. She does not recall specific things; it was a "very dark time" and she had no energy for anything else. Id.

On April 5, 2016, petitioner underwent a more involved cortisone injection procedure where the injection was administered directly into the shoulder joint capsule. Tr. 20-21. She obtained relief from this injection but still had the pain at night. Tr. 21. On July 14, 2017, she had her third cortisone injection. Tr. 22; Pet. Ex. 18 at 1-3.

On January 18, 2019, petitioner saw her primary care physician, Dr. Mueller. Tr. 24. Dr. Mueller's records from that visit state that petitioner still woke with throbbing shoulder pain

7

once or twice a week, and that the pain was better in the daytime.  Id.  Petitioner reported that her prior cortisone injections had helped her pain "for up to 6 months at a time."  Id.; Pet. Ex. 21 at 2.  Dr. Mueller noted that petitioner's joint appearance was normal and nontender.  Pet. Ex. 21 at 3.  He recommended Tylenol, ice, and to follow-up with orthopedics.  Id. at 4.

Petitioner saw Dr. Alexander on February 5, 2020.  Petitioner testified that Dr. Alexander discussed doing another MRI and mentioned the option of surgery.  Tr. 28.  Petitioner prefers not to undergo surgery.  Id.

Prior to her shoulder injury, petitioner testified that she liked to camp, hike, swim, and take her dogs on a long walk every day.  Tr. 22, 34.  She also loves her work and enjoys traveling.  Tr. 9.  Now, little things are difficult, and she is trying to adapt and limit herself.  Id.  The injury occurred four-and-one-half years ago.  Tr. 10.  Currently, her strength level in her left arm is limited, and she guards that arm.  Tr. 28.  The act of putting her suitcase in the overhead bin on her flight to Washington, D.C. for the hearing caused her to have throbbing pain during the night.  Tr. 30.  While at the hearing, with her arm in a resting position, petitioner testified that she had no pain.  Tr. 31.  However, she does have pain with movement, and she testified that it was time to have another cortisone injection.  Id.  Over-the-counter medications provide some relief for her night time pain, but when they wear off, her arm throbs.  Tr. 39.  Also, her pain is not as bad now; it is certainly better than before.  Tr. 40.

Petitioner testified that she did not have to take time off work due to her pain.  Tr. 40.

Petitioner stated that her injury has had a devasting impact on her life.  She believes her shoulder injury was a factor that contributed to her divorce.  Tr. 33.  She testified that she separated from her husband the end of 2015, about two months after receiving the vaccine.[4]  Tr. 40.  Petitioner stated that she and her husband had a very real marriage, and there were other factors that contributed to their divorce, but the pain of her shoulder injury made the couple "take a nosedive."  Tr. 41.

In addition to the impact on her marriage, petitioner also testified that her shoulder injury led her to give her dog "Josie" to her sister's family in the spring of 2016.  Tr. 41.  Petitioner had Josie for seven years.  Id.  After her shoulder injury, and the resulting fatigue of not sleeping well, she did not have the energy to walk Josie every day or otherwise provide the care the dog needed.  Tr. 34-35.

### e.  Affidavit and Hearing Testimony—Vincent M. Gentile

Mr. Vincent M. Gentile, petitioner's ex-husband, submitted a signed letter dated August 25, 2016, an affidavit, and testified at the hearing.  Tr. 46-56; Pet. Exs. 17, 25.  Mr. Gentile testified that he and petitioner married in 1987 and divorced in 2016.  Tr. 46.  They had three

---

[4] Petitioner's medical records dated December 23, 2013, note that petitioner and her husband were separated due to issues with her son.  Pet. Ex. 13 at 5.  Records dated June 10, 2015, also stated that petitioner was separated.  Pet. Ex. 13 at 42.  These records indicate that petitioner's separation from her husband may have predated her vaccination.

8

children.  Id.  Mr. Gentile testified that they separated a couple of months after the vaccination. Tr. 47.

Mr. Gentile stated that petitioner received a flu vaccination on October 15, 2015.  Pet. Ex. 25 at ¶ 1.  The following day, she reported that her shoulder was very sore and she awakened throughout the night with pain.  Tr. 47; Pet. Ex. 25 at ¶ 1.  Mr. Gentile also stated the pain continued to get worse "even after seeing an orthopedic doctor and going to physical therapy," and that petitioner continued to have pain in her shoulder and sleepless nights for many months. Pet. Ex. 17 at 1.

After petitioner's vaccination, petitioner did not sleep well.  Tr. 49.  Mr. Gentile testified that she was irritable, "out of sorts," and that she pulled away from everyone.  Tr. 48.  She would come home from work, and go to her room, and sleep.  Tr. 49.  While there were other factors at issue, Mr. Gentile testified that petitioner's shoulder injury was a contributing factor to the couple's divorce.  Tr. 50.  The other factors included a recent move, selling their house in Chicago, the lease ending on the home they were renting, and finances.  Id.

### f. Affidavits and Hearing Testimony—Barbara Glader and Timothy Glader

Petitioner's sister, Barbara Glader, and brother-in-law, Timothy Glader provided affidavits and testimony in support of petitioner.  Pet. Exs. 26-27; Tr. 56-73.  At the hearing, they both offered compelling testimony about how petitioner was unable to care for her beloved golden retriever, Josie, due to her shoulder pain.  Mr. Glader testified that the gravity of petitioner's situation dawned on him when petitioner asked if he would be willing to adopt Josie. Tr. 70-71.  Mr. Glader described Josie as a great dog, and they agreed to care for her, thinking the arrangement would only be temporary and that petitioner would improve and be able to care for Josie in the future.  Tr. 71.  Unfortunately, while still in the Glader's care, Josie developed terminal cancer and died.  Tr. 71-72.  Josie's death was extremely difficult for petitioner.  Tr. 72.

Barbara Glader testified that after her sister's shoulder injury, her sister became depressed.  Tr. 63.  She became a recluse and "completely pulled away."  Tr. 64.

### III.   PARTIES' CONTENTIONS

Petitioner seeks an award of $150,000.00 for past pain and suffering, and $1,500.00 per year for twenty-four years, the remainder of her life,[5] for future pain and suffering, to be reduced to net present value.  Pet. Prehearing Submission ("Pet. Submission"), dated Jan. 31, 2020, at 8 n.1 (ECF No. 61).  She asserts that these amounts are warranted based on the severity of her pain, evidenced by the need for four steroid injections over the course of two years.  Id. at 8. Further, petitioner testified that she was unable to sleep and exhausted, and that the pain

---

[5] Petitioner states that her life expectancy of twenty-four years was taken from the Social Security Administration's life expectancy calculator found at https://www.ssa.gov/planners/lifeexpectancy.html.  According to this source, petitioner is expected to live to age 86.3, and thus, has a life expectancy of another twenty-four years.  See Pet. Prehearing Submission, dated Jan. 31, 2020, at 8 n.1 (ECF No. 61).

9

contributed to the demise of her marriage. Id. at 9. Petitioner's pain and depression have lasted over four years and continue to the present day. Id. She lost her beloved dog, her active lifestyle, and finds everyday activities to be difficult and painful. Id. at 10.

Petitioner cites the case of Binette v. Secretary of Health & Human Services, in support of her position. No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019). Ms. Binette was awarded $130,000.00 for past pain and suffering, where the evidence showed that she suffered moderate to severe pain for approximately two years. Ms. Binette was also awarded $57,000.00 (before conversion to net present value), for future pain and suffering, based on her orthopedist's opinion that her injury was permanent. Petitioner here seeks an additional twenty thousand dollars more than Ms. Binette was awarded, because her pain has lasted longer, and the impact on her personal life has been greater.

Respondent proposed an award of $70,000.00 for past pain and suffering.[6] Resp. Brief on Damages ("Resp. Br."), dated Feb. 28, 2020, at 1 (ECF No. 71). Respondent cites the Dhanoa case, where petitioner was awarded $94,900.99 for pain and suffering, as similar, but more severe, to the facts and circumstances here. Dhanoa v. Sec'y of Health & Human Servs., No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018). Ms. Dhanoa was also in her fifties, received two steroid injections, and went to twenty-three physical therapy appointments. Respondent disagrees that Binette is comparable, since the petitioner there was younger and her condition was more serious. Resp. Br. at 6. Ms. Binette's shoulder condition was serious enough to warrant surgery but unfortunately, her shoulder was inoperable. Id.

## IV.   LEGAL FRAMEWORK

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Additionally, petitioner may recover "actual unreimbursable expenses incurred before the date of judgment," including those that "(i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." § 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. Brewer v. Sec'y of Health & Human Servs., No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. I.D. v. Sec'y of Health & Human Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); Stansfield v. Sec'y of Health & Human Servs., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors

---

[6] Respondent did not have the benefit of Dr. Alexander's second letter, dated March 19, 2020 and filed March 27, 2020, opining that petitioner's shoulder injury was permanent, when he filed his brief on damages on February 21, 2020.

to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering. I.D., 2013 WL 2448125, at *9 (quoting McAllister v. Sec'y of Health & Human Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case. See, e.g., Doe 34 v. Sec'y of Health & Human Servs., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). The undersigned may also rely on her experience adjudicating similar claims.[7] Hodges v. Sec'y of Health & Human Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. See Graves v. Sec'y of Health & Human Servs., 109 Fed. Cl. 579 (2013).

In Graves, Judge Merrow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merrow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." Graves, 109 Fed. Cl. at 589-90. Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. Id. at 595.

Although this case was removed from SPU on September 30, 2019, the undersigned finds statistical data from shoulder injury related to vaccine administration ("SIRVA") cases resolved in SPU to be informative, as they have an extensive history of informal resolution within the SPU.[8] As of January 1, 2020, 1,405 SIRVA cases have informally resolved[9] within the SPU since its inception in July 2014. Of those cases, 817 resolved via the government's proffer on

---

[7] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to undersigned as the former Chief Special Master, now Special Master Dorsey.

[8] Prior decisions awarding damages, including those resolved by settlement or proffer, are made public and can be searched on the U.S. Court of Federal Claims' website by keyword and/or by special master. On the Court's main page, click on "Opinions/Orders" to access the database. All figures included in this Ruling are derived from a review of the decisions awarding damages within SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximations.

[9] Additionally, 41 claims alleging SIRVA have been dismissed within the SPU.

award of compensation, following a prior ruling that petitioner is entitled to compensation.[10] Additionally, 567 SPU SIRVA cases resolved via stipulated agreement of the parties without a prior ruling on entitlement.

Among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $75,044.86 to $122,038.99,[11] with the median award at $95,000.00. Formerly, these awards were presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Since late 2017, the government's proffer has included subtotals for each type of compensation awarded.

Among SPU SIRVA cases resolved via stipulation, awards have typically ranged from $50,000.00 to $92,500.00,[12] with the median award at $70,000.00. In most instances, the parties continue to present the stipulated award as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Unlike the proffered awards, which purportedly represent full compensation for all of petitioner's damages, stipulated awards also typically represent some degree of litigative risk negotiated by the parties.

Additionally, since the inception of SPU in July 2014, there have been a number of reasoned decisions awarding damages in SPU SIRVA cases where the parties were unable to informally resolve damages. Typically, the primary point of dispute has been the appropriate amount of compensation for pain and suffering.

In seventeen prior SPU cases, petitioners were awarded compensation for pain and suffering below the amount of the median proffer discussed above. These awards for actual pain and suffering ranged from $60,000.00 to $90,000.00.[13] These cases included injuries with a

---

[10] There have been twenty-one prior cases in which petitioner was found to be entitled to compensation, but where damages were resolved via a stipulated agreement by the parties rather than government proffer.

[11] Typical range refers to cases within the second and third quartiles. Additional outlier awards also exist. The full range of awards spans from $25,000.00 to $1,845,047.00. Among the twenty-one SPU SIRVA cases resolved via stipulation following a finding of entitlement, awards range from $45,000.00 to $1,500,000.00 with a median award of $115,772.83. For these awards, the first and third quartiles range from $90,000.00 to $160,502.39.

[12] Typical range refers to cases within the second and third quartiles. Additional outlier awards also exist. The full range of awards spans from $5,000.00 to $509,552.31. Additionally, two stipulated awards were limited to annuities, the exact amounts of which were not determined at the time of judgment.

[13] These cases are: Dagen v. Sec'y of Health & Human Servs., No. 18-0442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019) (awarding $65,000.00 for actual pain and suffering and $2,080.14 for actual unreimbursable expenses); Goring v. Sec'y of Health & Human Servs., No. 16-1458V, 2019 WL 6049009 (Fed. Cl. Spec. Mstr. Aug. 23, 2019)

(continued. . . )

"good" prognosis, albeit in some instances with some residual pain. Petitioners in these cases had mild to moderate limitations in range of motion and MRI imaging likewise showed evidence of mild to moderate pathology such as tendinosis and bursitis. The duration of injury ranged from six to twenty-nine months and, on average, these petitioners experienced approximately fourteen months of pain.

Significant pain was reported in these cases for up to eight months. However, in approximately half of the cases, these petitioners subjectively rated their pain as six or below on a ten-point scale. Petitioners who reported pain in the upper end of the ten-point scale generally suffered pain at this level for three months or less. Slightly less than one-half were administered one to two cortisone injections. Most of these petitioners pursued physical therapy for two months or less and none had any surgery. The petitioners in Schandel, Garrett, and Weber

---

(awarding $75,000.00 for actual pain and suffering and $200.00 for actual unreimbursable expenses); Lucarelli v. Sec'y of Health & Human Servs., No. 16-1721V, 2019 WL 5889235 (Fed. Cl. Spec. Mstr. Aug. 21, 2019) (awarding $80,000.00 for actual pain and suffering and $380.54 for actual unreimbursable expenses); Kent v. Sec'y of Health & Human Servs., No. 17-0073V, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019) (awarding $80,000.00 for actual pain and suffering and $2,564.78 to satisfy petitioner's Medicaid lien); Capasso v. Sec'y Health & Human Servs., No. 17-0014V, 2019 WL 5290524 (Fed. Cl. Spec. Mstr. July 10, 2019) (awarding $75,000.00 for actual pain and suffering and $190.00 for actual unreimbursable expenses); Schandel v. Sec'y of Health & Human Servs., No. 16-0225V, 2019 WL 5260368 (Fed. Cl. Spec. Mstr. July 8, 2019) (awarding $85,000.00 for actual pain and suffering and $920.03 for actual unreimbursable expenses); Bruegging v. Sec'y of Health & Human Servs., 2019 WL 2620957 (awarding $90,000.00 for actual pain and suffering and $1,163.89 for actual unreimbursable expenses); Pruett v. Sec'y of Health & Human Servs., No. 17-0561V, 2019 WL 3297083 (Fed. Cl. Spec. Mstr. Apr. 30, 2019) (awarding $75,000.00 for actual pain and suffering and $944.63 for actual unreimbursable expenses); Bordelon v. Sec'y of Health & Human Servs., No. 17-1892V, 2019 WL 2385896 (Fed. Cl. Spec. Mstr. Apr. 24, 2019) (awarding $75,000.00 for actual pain and suffering); Weber v. Sec'y of Health & Human Servs., No. 17-0399V, 2019 WL 2521540 (Fed. Cl. Spec. Mstr. Apr. 9, 2019) (awarding $85,000.00 for actual pain and suffering and $1,027.83 for actual unreimbursable expenses); Garrett v. Sec'y of Health & Human Servs., No. 18-0490V, 2019 WL 2462953 (Fed. Cl. Spec. Mstr. Apr. 8, 2019) (awarding $70,000.00 for actual pain and suffering); Attig v. Sec'y of Health & Human Servs., No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019) (awarding $75,000.00 for pain and suffering and $1,386.97 in unreimbursable medical expenses); Dirksen v. Sec'y of Health & Human Servs., 2018 WL 6293201 (awarding $85,000.00 for pain and suffering and $1,784.56 in unreimbursable medical expenses); Kim v. Sec'y of Health & Human Servs., No. 17-0418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses); Knauss v. Sec'y of Health & Human Servs., 2018 WL 3432906 (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); Marino v. Sec'y of Health & Human Servs., 2018 WL 2224736 (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); Desrosiers v. Sec'y of Health & Human Servs., No. 16-0224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses).

attended physical therapy from almost four to five months, but most of the physical therapy in Weber focused on conditions unrelated to the petitioner's SIRVA. Several of these cases (Goring, Lucarelli, Kent, Knauss, Marino, Kim, and Dirksen) included a delay in seeking treatment. These delays ranged from about forty-two days in Kim to over six months in Marino.

Additionally, in eight prior SPU cases, the petitioner was awarded compensation limited to past pain and suffering above the median proffered SIRVA award. These awards have ranged from $110,000.00 to $160,000.00.[14] Like those in the preceding group, prognosis was "good." However, as compared to those petitioners receiving a below-median award, these cases were characterized either by a longer duration of injury or by the need for surgical repair. Seven out of eight underwent some form of shoulder surgery while the eighth (Cooper) experienced two full years of pain and suffering, eight months of which were considered significant, while seeking extended conservative treatment. On the whole, MRI imaging in these cases also showed more significant findings. In seven out of eight cases, MRI imaging showed possible evidence of partial tearing.[15] No MRI study was performed in the Cooper case.

---

[14] These cases are: Nute v. Sec'y of Health & Human Servs., No. 18-0140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019) (awarding $125,000.00 for pain and suffering); Kelley v. Sec'y of Health & Human Servs., No. 17-2054V, 2019 WL 5555648 (Fed. Cl. Spec. Mstr. Aug. 2, 2019) (awarding $120,000.00 for pain and suffering and $4,289.05 in unreimbursable medical expenses); Wallace v. Sec'y of Health & Human Servs., No. 16-1472V, 2019 WL 4458393 (Fed. Cl. Spec. Mstr. June 27, 2019) (awarding $125,000.00 for pain and suffering and $1,219.47 in unreimbursable medical expenses); Reed v. Sec'y of Health & Human Servs., No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering and $4,931.06 in unreimbursable medical expenses); Knudson v. Sec'y of Health & Human Servs., No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses); Cooper v. Sec'y of Health & Human Servs., No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses); Dobbins v. Sec'y of Health & Human Servs., No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses); Collado v. Sec'y of Health & Human Servs., No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses).

[15] In Reed, MRI showed edema in the infraspinatus tendon of the right shoulder with a possible tendon tear and a small bone bruise of the posterior humeral head. In Dobbins, MRI showed a full-thickness partial tear of the supraspinatus tendon extending to the bursal surface, bursal surface fraying and partial thickness tear of the tendon, tear of the posterior aspects of the inferior glenohumeral ligament, and moderate sized joint effusion with synovitis and possible small loose bodies. In Collado, MRI showed a partial bursal surface tear of the infraspinatus and of the supraspinatus. In Knudson, MRI showed mild longitudinally oriented partial-thickness tear of the infraspinatus tendon, mild supraspinatus and infraspinatus tendinopathy, small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the humeral head adjacent to the infraspinatus tendon insertion site, and minimal subacromial-subdeltoid bursitis.

During treatment, each of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and all experienced moderate to severe limitations in range of motion. Moreover, these petitioners tended to seek treatment of their injuries more immediately. Time to first treatment ranged from five days to forty-five days. Duration of physical therapy ranged from one to twenty-eight months and six out of the eight had cortisone injections.

There are few SIRVA cases where petitioners have been awarded compensation for both actual and future pain and suffering.[16] In Hooper and Binette, petitioners experienced moderate to severe limitations in range of motion and moderate to severe pain. The petitioner in Hooper underwent surgery while the petitioner in Binette was deemed to not be a candidate for surgery following an arthrogram. Despite significant physical therapy, medical opinions indicated that their disability would be permanent.

### V.   APPROPRIATE COMPENSATION IN THIS SIRVA CASE

In this case, awareness of the injury is not in dispute. The record reflects that at all relevant times petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, the undersigned's analysis will focus principally on the severity and duration of petitioner's injury.

The medical records establish that petitioner did not seek treatment for her SIRVA until about two months after vaccination. At that time, Dr. Alexander documented that petitioner had full range of motion, with pain on lifting her arm and dressing. Petitioner's pain was not quantified by a number on the pain scale, but Dr. Alexander did administer a cortisone injection, evidencing that her pain and condition was severe enough to warrant the injection. At her first physical therapy appointment on December 7, 2015, petitioner rated her pain in the mild range, 2/10. The physical therapist noted that petitioner's prognosis was good.

By December 14, 2015, petitioner reported to her physical therapist that her shoulder was feeling better. Therefore, within two months of vaccination, the medical records establish that petitioner had fairly mild pain and full range of motion.

---

[16] These cases are: Dhanoa, 2018 WL 1221922 (awarding $85,000.00 for actual pain and suffering, $10,000.00 for projected pain and suffering for one year, and $862.15 in past unreimbursable medical expenses); Curri v. Sec'y of Health & Human Servs., No. 17-432V, 2018 WL 6273562 (Fed. Cl. Spec. Mster. Oct. 31, 2018) (awarding $550.00 per year for future pain and suffering where petitioner had a scheduled loss of use of 22.5% of her left arm); Binette, 2019 WL 1552620 (awarding $130,000.00 for actual pain and suffering, $1,000.00 per year for a life expectancy of 57 years for projected pain and suffering, and $7,101.98 for past unreimbursable medical expenses); Hooper v. Sec'y of Health & Human Servs., No. 17-0012V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for actual pain and suffering, $1,500.00 per year for a life expectancy of 30 years for projected pain and suffering where petitioner had a 50% disability of his left shoulder, $37,921.48 for lost wages).

15

Moving forward to 2016, petitioner did not return to physical therapy until February 22, 2016, and at that time, she rated her pain as 3-4/10 with overhead motion and 5/10 with rotational movements. Her range of motion, however, was still within normal parameters. She attended fifteen physical therapy appointments from February until early May 2016. During this time frame petitioner often described her pain as "soreness," and rated her pain 2/10, and at rest 1/10. She consistently reported problems sleeping and dressing. After she received a cortisone injection in April 2016, she improved. Petitioner stated that her shoulder felt "really really good." Pet. Ex. 10 at 65. She stated that she had no pain. Pet. Ex. 10 at 65. After her discharge from physical therapy in May 2016, there is no medical record evidence that petitioner experienced shoulder pain the rest of that year. In summary, the records establish that by May 2016, approximately six months after vaccination, petitioner had good range of motion, felt well, and had no pain.

Petitioner did not seek treatment for her shoulder again until July 2017, when she underwent another cortisone injection, evidencing a return of or ongoing shoulder pain. There are no medical records from 2017 that document shoulder pain or any limitations with range of motion. The records are silent until March 2018, when petitioner's medical records note "chronic left shoulder pain" in her problem list. Pet. Ex. 20 at 3. The same records reflect that petitioner's range of motion and use of her arm were "okay," but she had a catching with abduction. Id. There is no other description of pain or limitation in petitioner's 2018 medical records. The sparse records for 2017 through 2018 do no support petitioner's assertions of ongoing significant pain or limited range of motion during these years.

At her annual physical with Dr. Mueller in January 2019, petitioner reported that she still had throbbing shoulder pain that awakened her at night once or twice a week. Dr. Muller recommended that she take Tylenol, use ice, and follow up with her orthopedist. Ten months later, she returned to see Dr. Mueller on October 2019. At that time, Dr. Mueller documented that petitioner has "[r]ecurrent left shoulder pain." Pet. Ex. 22 at 1. Dr. Mueller also documented that petitioner's later cortisone injection into the joint capsule had helped alleviate her pain. Id. Dr. Mueller recommended that petitioner have physical therapy and see her orthopedist. Petitioner attended one physical therapy appointment but did not return for the recommended therapy.

Petitioner saw Dr. Alexander in February 2020. She described a "catching" of her shoulder, and pain with reaching and overhead movements. She also complained of disrupted sleep. Dr. Alexander performed a physical exam and noted mild tenderness and slight loss of range of motion in forward flexion and abduction. He recommended a repeat cortisone injection.

Petitioner's medical records establish that she suffered a mild to moderate SIRVA injury for approximately six months, with moderate pain noted at one physical therapy visit with certain movements. She did not have significantly decreased range of motion. She did have loss of sleep caused by pain at night. However, other than petitioner's testimony, there is no evidence that she ever experienced severe levels of pain. As previously held by the Federal Circuit, it is appropriate for a special master to give greater weight to evidence contained in medical records created closer in time to the vaccination. Curcuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993). Medical records are the most reliable evidence about a petitioner's

medical condition and the effect it has on daily life.  Shapiro v. Sec'y of Health & Human Servs., 101 Fed. Cl. 532, 537-38 (2011) ("There is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections.").  Further, the paucity of relevant medical records after May 2016, leaves the valuation of petitioner's pain and suffering challenging.  See, e.g., Marino, 2018 WL 2224736, at *8.

The undersigned has reviewed the cases cited by both petitioner and respondent to support their respective positions on the appropriate amount of an award for pain and suffering.  Additional SIRVA damages awards where petitioners have had similar clinical courses have also been reviewed.  Each case is very fact specific and no single decision or award of compensation necessarily accounts for the specific circumstances in this case, however, the Dhanoa case provides a frame of reference for damages here.

Like Ms. Gentile, Ms. Dhanoa was first seen for shoulder pain approximately two months after vaccination.  Dhanoa, 2018 WL 1221922, at *3.  Both petitioners were about the same age at the time of their injuries.  However, Ms. Gentile did not describe severe pain and had full range of motion at the time of presentation.  In contrast, when first seen by her orthopedist, Ms. Dhanoa had marked limitation of internal and external rotation and severe pain, rated at 9.5 to 10.  Id. at *5.  Ms. Dhanoa had severe pain for approximately the first six months of her injury, and thereafter had moderate pain, rated at level five, three years after vaccination.  Id. at *5.  In comparison, Ms. Gentile generally described her pain as a soreness, and cortisone injections improved her pain for significant periods of time.  Both petitioners described pain when dressing and sleeping.  Both had similar findings on their MRIs, showing rotator cuff tendinopathy.  Both had cortisone injections.  Both were diagnosed with adhesive capsulitis and referred to physical therapy.  Ms. Dhanoa attended a total of twenty-three physical therapy sessions, while Ms. Gentile attended nineteen sessions.  Finally, both petitioners complained of not being able to participate in activities that had previously enjoyed, and had pain at the time of their respective hearings.  While Ms. Gentile did not experience the severity of pain described by Ms. Dhanoa in medical records, she did experience the emotional distress of relinquishing her beloved dog and the demise of her marriage.

Based on a review of the entire record and consideration of the facts and circumstances presented here, as well as the cases cited by the parties, the undersigned finds that $85,000.00 is an appropriate award for petitioner's actual pain and suffering.

With regard to compensation for future pain and suffering, the two cases most analogous to the present one are Dhanoa and Curri.  In Dhanoa, the petitioner was awarded $10,000 for pain and suffering for the year immediately following the decision, but no award for subsequent years.  Dhanoa, 2018 WL 1221922, at *7.  In Curri, considering petitioner's significant arm pain, her permanently reduced range of motion, and the unique changes petitioner facts in her day-to-day life as a working mother of three children, the special master awarded $550.00 per year for future pain and suffering.  Curri, 2018 WL 6273562, at *6.  Here, Ms. Gentile's orthopedist, Dr. Alexander, opined that since she has had shoulder pain for five years (since vaccination), he suspected her pain would be permanent.  He had "no reason to think this [pain]" would resolve.  Pet. Ex. 31 at 1.  Dr. Alexander did not, however, provide any disability rating.  Based on Dr.

Alexander's opinion, and the chronicity of her shoulder pain, the undersigned finds an award for future pain and suffering appropriate.

Ms. Gentile's injury is less severe that any of the other injuries suffered by petitioners who have been awarded future pain and suffering damages. She has not been assessed with any disability rating. At her last orthopedist appointment, she had only a slight loss of range of motion. Over the course of her condition, her medical records generally show mild pain levels and little loss of use. Given the facts and circumstances unique to her condition, the undersigned awards $500.00 per year for twenty-four years, the remainder of her life, for future pain and suffering, to be reduced to net present value.

### VI. CONCLUSION

In determining petitioner's award, the undersigned does not rely on a single decision or case. Rather, she has reviewed the particular facts and circumstances here, giving due consideration of the circumstances and damages in other cases, as well as her knowledge and experience adjudicating similar cases.

**In light of the above analysis, and in consideration of the record as a whole, the undersigned finds that petitioner should be awarded $85,000.00 for actual pain and suffering, and $500.00 per year reduced to net present value, for the rest of her life expectancy, for future pain and suffering. Ms. Gentile's date of birth is July 31, 1957, and her remaining life expectancy is approximately twenty-four years. Thus, her future pain and suffering damages total $12,000.00, prior to conversion to net present value. The undersigned also finds (based on the agreement of the parties) that petitioner is entitled to compensation in the amount of $1,199.38 for her past unreimbursed expenses.**

**The parties are to file a joint status report no later than by Tuesday, August 4, 2020 converting the undersigned's award of future pain and suffering to net present value. If the parties are unable to come to an agreement as to the net present value, the undersigned will apply a discount rate of 1% for the first fifteen years and a discount rate of 2% thereafter.[17] Once this issue is resolved, a damages decision will issue.**

**IT IS SO ORDERED.**

s/Nora Beth Dorsey  
Nora Beth Dorsey  
Special Master

---

[17] See, e.g., Curri, 2018 WL 6273562, at *4-5; Neiman v. Sec'y of Health & Human Servs., No. 15-631V, 2016 WL 7741742, at *1 (Fed. Cl. Spec. Mstr. Oct. 31, 2016).